COURT OF APPEALS
DECISION
DATED AND FILED

May 14, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP382**

STATE OF WISCONSIN

Cir. Ct. No. 2021CV22

IN COURT OF APPEALS
DISTRICT III

W. C. B.,

PLAINTIFF-APPELLANT,

V.

EMCASCO INSURANCE COMPANY AND
SCHOOL DISTRICT OF DURAND-ARKANSAW,

DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Pepin County: THOMAS W. CLARK, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM. William[1] appeals from a circuit court order granting summary judgment to the School District of Durand-Arkansaw and its insurer, EMCASCO Insurance Company,[2] dismissing William's claims of negligence against the District on several grounds. We conclude that the District is immune from suit under WIS. STAT. § 893.80(4) (2021-22),[3] and we therefore need not address William's remaining arguments. Accordingly, we affirm.

## BACKGROUND

¶2      William's claims of negligence against the District are predicated on repeated sexual contact that Sarah Heskin—a first-year teacher and William's eighth grade English teacher—had with William from approximately October 2018 to May 2019. There is no dispute that the criminal sexual conduct between Heskin and William occurred, and we need not recount the progression or details of that conduct here.[4] It is also undisputed that the District's staff had no knowledge of the sexual and physical involvement[5] between Heskin and William until May 2019. However, William argues that the teaching staff at the school were "aware of the unexplained and excessive time Heskin spent alone with" him

---

[1] For ease of reading, we refer to the appellant using a pseudonym, rather than his initials.

[2] For ease of reading, we will refer to the respondents collectively as "the District."

[3] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[4] During a police interview, Heskin admitted to the criminal conduct. Heskin eventually pled guilty to second-degree sexual assault of a child and is currently serving a five-year sentence.

[5] From time to time, we refer in this decision to the criminal conduct underlying this case as an "involvement," not to ascribe any romantic attachment to Heskin's conduct, but to succinctly describe the connection between the parties.

and that those in positions of authority within the District were made aware of staff members' concerns.

¶3      According to the District, it was not until May 1, 2019—when a female high school student, who was the sister of one of William's friends, reported the involvement to the school nurse—that the District became aware of the possible sexual and physical nature of Heskin's involvement with William (hereinafter, the May 2019 disclosure).   Thereafter, the District contacted law enforcement and began an investigation, "parallel to the investigation [under]taken by law enforcement."

¶4      On July 16, 2021, William filed this complaint against the District, alleging that it was negligent by failing to discover and prevent Heskin and William's involvement; negligent by failing to report the involvement to William's parent; and negligent in the hiring, training, and supervision of Heskin.[6] After discovery, the District moved for summary judgment, arguing that William's claims must be dismissed because: (1) the claims premised on actions occurring prior to April 29, 2019, were time-barred by William's untimely submission of a

---

[6] William had previously submitted a document to the District on August 27, 2019, entitled "Notice of Claim for Damages," which detailed the circumstances of his claim in this case (hereinafter, notice of injury).   (Formatting altered.)   The notice of injury alleged that William "was harmed when he was sexually assaulted and exposed to sexually explicit content on multiple occasions by his teacher, Sarah Heskin[,]" and that the District's administration "knew or should have known about the incidents and taken action to stop them."   William's notice of injury further claimed that his "harm was caused by the tortious conduct of the … District [and] its agents and employees."

notice of injury pursuant to WIS. STAT. § 893.80(1d)(a);[7] (2) the District was not liable for Heskin's actions because they were intentional and outside the scope of her employment; and (3) the District was immune from liability.

¶5      William opposed summary judgment on several grounds.  First, William argued that the District had actual notice of the injury following the May 2019 disclosure, and the District "was not prejudiced by any failure to get an earlier signed notice of the circumstance of a claim" because "it is hard to conceive what additional investigation would have been done."  *See* WIS. STAT. § 893.80(1d)(a).  Second, William disclaimed the District's suggestion that it was not liable under WIS. STAT. § 895.46 or a theory of respondeat superior because it "allowed Heskin, a new teacher, unsupervised out-of-class time contact with a student after numerous and repeated concerns expressed by district employees," thereby violating its duty of ordinary care to William.  Third, William claimed that governmental immunity did not apply because the District failed to fulfill a ministerial duty created by the District's policies and the District's Student & Families Handbook (hereinafter, the handbook) and/or because Heskin's involvement with William was a known and compelling danger.

---

[7] The notice of claim statute provides, subject to certain exceptions: "no action may be brought or maintained against any … political corporation, governmental subdivision or agency thereof … upon a claim or cause of action" unless two prerequisites are met.  WIS. STAT. § 893.80(1d).  First, § 893.80(1d)(a) requires the claimant to serve "written notice of the circumstances of the claim" on the governmental body "[w]ithin 120 days after the happening of the event giving rise to the claim," which our case law refers to as the "notice of injury" requirement.  *See Yacht Club at Sister Bay Condo. Ass'n, Inc. v. Village of Sister Bay*, 2019 WI 4, ¶20, 385 Wis. 2d 158, 922 N.W.2d 95.  Second, § 893.80(1d)(b) requires the claimant to present "[a] claim containing the address of the claimant and an itemized statement of the relief sought" to the governmental body, which is referred to as the "notice of claim" requirement. *See Yacht Club*, 385 Wis. 2d 158, ¶20.

¶6    The circuit court held a nonevidentiary hearing on the District's motion and issued its oral ruling, granting summary judgment to the District. The court determined that under WIS. STAT. § 893.80(1d)(a), "actual notice should indicate that the injured party intends to hold the defendant liable," *see* ***Clark v. League of Wis. Muns. Mut. Ins. Co.***, 2021 WI App 21, ¶14, 397 Wis. 2d 220, 959 N.W.2d 648 ("[A]ctual notice must be 'of the *claim*,' rather than of the mere 'circumstances' that may later give rise to a claim."); therefore, the court agreed that the litigation could not proceed with respect to actions prior to April 29, 2019. The court also reasoned that Heskin's actions were intentional and outside the scope of her employment, meaning the District was not liable for her actions. Finally, the court concluded that the District was immune from this suit by virtue of § 893.80(4). The court rejected William's arguments that the District's policies and handbook imposed a ministerial duty to investigate Heskin's behavior, discipline Heskin, or contact William's parent and that the known and compelling danger exception applied. The court entered a written order dismissing William's complaint with prejudice and with costs. William appeals.

**DISCUSSION**

¶7    On appeal, William renews most of the claims that he raised in the circuit court. As noted above, the court granted summary judgment to the District, in part, based on its conclusion that the District was immune from liability under WIS. STAT. § 893.80(4). For the reasons that follow, we agree that the District is immune from this suit under § 893.80(4) because no ministerial duty imposed by law was violated and there was no known and compelling danger that gave rise to a ministerial duty. Because this issue is dispositive, we need not address the parties' other arguments or the other bases for the circuit court's decision.

5

*See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (when one issue is dispositive of an appeal, we need not discuss other issues).

¶8      WISCONSIN STAT. § 893.80(4) generally immunizes school districts, as well as other governmental units, from liability arising out of "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions," *see Heuser ex rel. Jacobs v. Community Ins. Corp.*, 2009 WI App 151, ¶20, 321 Wis. 2d 729, 774 N.W.2d 653, which our supreme court "has consistently interpreted … [as] any acts that involve the exercise of discretion," *Engelhardt v. City of New Berlin*, 2019 WI 2, ¶22, 385 Wis. 2d 86, 921 N.W.2d 714.  Under certain circumstances, however, governmental immunity does not apply.  *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶24, 253 Wis. 2d 323, 646 N.W.2d 314.  In this case, William invokes both the ministerial duty and the known and compelling danger exceptions to governmental immunity.  *See id.*  These two exceptions "overlap to an extent, inasmuch as they both require the identification of a ministerial duty."  *Pries v. McMillon*, 2010 WI 63, ¶24, 326 Wis. 2d 37, 784 N.W.2d 648.

¶9      As noted above, William's complaint asserts two general claims against the District: (1) negligence by failing to recognize and stop Heskin and William's involvement and by failing to notify William's parent;[8] and (2) negligent training, hiring, and supervision of Heskin.  To determine whether governmental immunity applies, we assume that the District was negligent, "focusing instead on whether the [District's] action (or inaction) upon which

---

[8] William does not claim that the District was negligent in its response after the May 2019 disclosure.

liability is premised is entitled to immunity under the statute, and if so, whether one of the judicially-created exceptions to immunity applies." *See Lodl*, 253 Wis. 2d 323, ¶17. Therefore, any factual disputes regarding the District's negligence will not prevent summary judgment. *See Meyers v. Schultz*, 2004 WI App 234, ¶10, 277 Wis. 2d 845, 690 N.W.2d 873.

¶10 The application of WIS. STAT. § 893.80(4) and its exceptions to a set of facts is a question of law we review de novo. *See Kierstyn v. Racine Unified Sch. Dist.*, 228 Wis. 2d 81, 88, 596 N.W.2d 417 (1999). This case comes before us on the circuit court's grant of summary judgment to the District. Appellate review of an order granting summary judgment is also de novo and requires us to apply the same methodology as the circuit court, while benefiting from its analysis. *Lodl*, 253 Wis. 2d 323, ¶15; WIS. STAT. § 802.08(2).

*I. Ministerial Duty*

¶11 "The ministerial duty exception is not so much an exception as a recognition that immunity law distinguishes between discretionary and ministerial acts, immunizing the performance of the former but not the latter." *Lodl*, 253 Wis. 2d 323, ¶25. A ministerial duty is "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Engelhardt*, 385 Wis. 2d 86, ¶32 (citation omitted). The "law" imposing a ministerial duty may include "statutes, administrative rules, policies or orders." *Meyers*, 277 Wis. 2d 845, ¶19.

¶12 William makes two arguments that the District breached a ministerial duty imposed by law. First, he argues that District Policy 3213,

7

addressing student supervision and welfare, created a ministerial duty requiring the District to act. William cites to subsection H. of Policy 3213,[9] which provides, in pertinent part:

> A professional staff member shall not associate with students at any time in a manner which gives the appearance of impropriety …. Any sexual or other inappropriate conduct with a student by any staff member will subject the offender to potential criminal liability and discipline up to and including termination of employment.

According to William, the Policy's use of "[t]he words 'shall,' 'any time,' 'any' and 'will' all obligate the School District to act even when there is the simple appearance of impropriety which certainly existed in this case." William alleges that "[d]espite Policy 3213, the School District administration did not discipline Heskin or even confront her informally[10] despite having months of knowledge that there was an inappropriate involvement between Heskin and" William.

---

[9] We note, as the District does, that there were two different versions of Policy 3213 in effect during the 2018-19 school year. The first version—in effect until March 20, 2019—stated, in pertinent part: "A professional staff member, or a person who works or volunteers with children, who is found to have had sexual contact with a student, including a student age sixteen (16) or older, shall be referred to the proper authorities and be subject to discipline up to and including discharge." William's arguments focus on the language of the second version of Policy 3213, which expanded upon the standards of care for the supervision, control, and protection of students.

The District agrees that the second version of Policy 3213 "was applicable at times pertinent to [William's] pending claims," given the circuit court's ruling, pursuant to WIS. STAT. § 893.80(1d), that William's claims predating April 29, 2019, are barred. Thus, we will consider the second version of Policy 3213 for the purpose of this decision.

[10] Although we do not address factual disputes regarding the District's negligence in this decision, it is worth noting that although William claims that the District did "nothing," he also essentially admits that the staff's concerns were not ignored. In his briefing, William explains that Heskin's assigned mentor (a seasoned teacher) spoke with Heskin and that the principal also spoke with Heskin. The record also states that the principal followed up after his conversation with Heskin by observing her classroom during noninstructional times, and the principal believed that "the amount of time that [William] was spending in [Heskin's] class[room] decreased after [he] had [a] conversation with [Heskin]."

¶13 We disagree that simply because Policy 3213 contains some mandatory language, it imposed a ministerial duty on the District. Any alleged duty under Policy 3213 "suffer[s] from a critical lack of particularity as to time, mode and occasion of [its] performance, an essential ingredient of a ministerial duty." *See* ***Yao v. Chapman***, 2005 WI App 200, ¶31, 287 Wis. 2d 445, 705 N.W.2d 272. First, Policy 3213 specifically states that it is the intent of the school board to direct the preparation of "guidelines" that would minimize the possibility of the incorrect handling of situations that could result in liability to the District, personal liability of a professional staff member, or harm to student welfare. Policy 3213 then states that each District employee "shall maintain a standard of care for the supervision, control, and protection of students commensurate with his/her assigned duties and responsibilities." However, Policy 3213 does not specify how the staff is to determine whether the standards set are commensurate with a staff person's assigned duties and responsibilities.

¶14 Further, and of primary importance, Policy 3213 does not specifically regulate and provide guidelines for the District's staff's *response* to a violation of the policy's guidelines for staff conduct. At most, Policy 3213 states that an offender, in certain situations, will be "subject" to "discipline" or termination of employment. In other words, as the District argues, it is clear that Heskin was likely violating several guidelines in Policy 3213, but "her actions are not the subject of this [c]ourt's immunity analysis." Instead, the question is whether Policy 3213 imposed a ministerial duty *on the District* and whether that duty was breached.

¶15 Second, even if we accept William's claim that the language of Policy 3213 obligates the District to act, we conclude that Policy 3213 leaves judgment and discretion as to the "occasion" of the performance of the duty to act

in the hands of the District. For instance, Policy 3213 prohibits staff members from "associat[ing] with students … in a manner which gives the *appearance of impropriety*." (Emphasis added.) The phrase "appearance of impropriety" remains entirely undefined, except that it "should not be construed as precluding a professional staff member from associating with students in private for legitimate or proper reasons or to interfere with familial relationships that may exist between staff and students." Thus, the phrase clearly leaves to the District the duty of defining what constitutes the appearance of impropriety between staff and students, when and to whom those interactions may appear improper, and what may instead be a "legitimate or proper reason[]" for private interactions between students and staff. Further, we question whether the phrase "appearance of impropriety" and the phrase "other inappropriate conduct with a student," used later in Policy 3213, would encompass the same behaviors or different behaviors and what the parameters of each of those definitions may be.

¶16 Similarly, Policy 3213's directive that "[a]ny sexual or other inappropriate conduct with a student by any staff member will subject the offender to potential criminal liability and discipline up to and including termination of employment" also lacks the requisite specificity to provide the District with a ministerial duty to act. The policy is silent as to what type of discipline a staff member may receive—i.e., whether the "discipline" may include only an expression of concern, an admonishment, or a warning from District administrators or whether something more formal, but less severe than termination, is required—or what should happen if the conduct continues. Those judgments are up to the District, which "is a hallmark of a discretionary, as opposed to ministerial, act." *See American Fam. Mut. Ins. Co. v. Outagamie County*, 2012 WI App 60, ¶24, 341 Wis. 2d 413, 816 N.W.2d 340. Thus,

10

Policy 3213 also lacks specificity as to the "mode" of the performance of the District's alleged duty to act.

¶17     Despite William's arguments on appeal, the questions before us are not whether the District violated Policy 3213, how that violation occurred, or what resulted from the violation.  The question we must address is whether the specific language of Policy 3213 created a ministerial duty to act.  We conclude that because Policy 3213 is not "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion," it did not impose a ministerial duty for the District to act in a certain manner prior to the May 2019 disclosure. *See Engelhardt*, 385 Wis. 2d 86, ¶32 (citation omitted).

¶18     William's second argument is that the District's handbook imposed a ministerial duty on the District to notify his parent of the involvement with Heskin.[11]  According to William, the handbook states: "Parents/guardians have the right to know how their child is succeeding in school and will be provided information on a regular basis and as needed, when concerns arise."  He argues that "[t]he [h]andbook provides a non-discretionary on-going duty to inform parents when concerns arise.  It does not grant the District discretion to decide

---

[11] On appeal, William cites to the 2022-2023 handbook.  The District argues, however, that "[t]his argument must be summarily rejected because there is no evidence that the 2022-2023 [h]andbook was in effect during the 2018-2019 school year" and that "[t]he 2022-2023 [handbook] was never authenticated; it was simply attached to [William's] counsel's affidavit in opposition to the District's Motion for Summary Judgment."  In reply, William observes that "[t]he District does not argue that the language cited was not in effect at the time of the assaults, nor provide any prior version."  For the purpose of this decision, we will assume, without deciding, that the provision of the handbook that William cites was in effect during the pertinent time period.

whether it will or will not share concerns about students with their parents." William claims that the District violated this duty because "[m]ultiple teachers had concerns about the amount of time Heskin spent with [William]" as early as October 2018, but William's mother "first learned that Heskin was having extensive conduct with [William] outside of classroom time when the police notified her on May 2, 2019."

¶19     We disagree that the District handbook imposed a ministerial duty on the District to act as William argues.  The handbook's directive is not as clear-cut and nondiscretionary as William suggests.  The entire paragraph in the handbook actually provides:

> Parents/guardians have the right to know how their child is succeeding in school and will be provided information on a regular basis and as needed, when concerns arise.  Many times it will be the responsibility of the student to deliver that information.  If necessary, the mail or hand delivery may be used to ensure contact.  Parents/guardians are encouraged to build a two-way link with their child's teachers and support staff by informing the staff of suggestions or concerns that may help their child better accomplish their educational goals.  Parents/families are encouraged to use Skyward Family Access to monitor their child's progress.

As the District argues, this provision is entirely too vague to impose a ministerial duty.  Neither the handbook nor William identify *who* should be communicating with parents or guardians.  In fact, the handbook's language actually states that "[m]any times it will be the responsibility of the student to deliver … information."  The handbook discusses communication regarding a student's success without specifying how that success is determined, and it does not identify exactly when or how often the communication should occur.  Instead,

the handbook says on "a regular basis" and "as needed," which clearly leaves the communication to the discretion of the unknown District entity or the student.[12] Finally, the handbook does not define what constitutes a "concern[]." As the District argues, a concern could be "a formal complaint, a verbal disciplinary warning, a formal discipline action, or a staff member's subjective assessment of the student's well-being[.]"

¶20 William's argument in his reply brief actually belies his claim regarding the handbook because he admits the District's discretion under the handbook provision, stating that "[w]ho communicates with [William's] parent[] is up to the District, but that does not absolve it from the duty of communicating." William appears to ascribe a general definition of a duty to the handbook's parental communication provision, but a *ministerial* duty for the purposes of governmental immunity encompasses a very specific definition, which does not include discretion. *See Engelhardt*, 385 Wis. 2d 86, ¶32; *Knoke v. City of Monroe*, 2021 WI App 6, ¶46, 395 Wis. 2d 551, 953 N.W.2d 889 (2020) ("Not all

---

[12] Citing *Umansky v. ABC Insurance Co.*, 2009 WI 82, 319 Wis. 2d 622, 769 N.W.2d 1, William claims that "[a] ministerial duty can exist despite not identifying the frequency of the communication." In *Umansky*, the plaintiff fell to his death while working on an unguarded platform located eight feet above the ground, and our supreme court concluded that the Wisconsin Administrative Code, in conjunction with a federal regulation mandating a railing on all platforms located more than four feet above ground, created a ministerial duty. *Id.*, ¶¶1-2, 16-18. William argues that "[d]espite the regulation having no definite time for compliance, the [c]ourt found there was sufficient time, mode, and occasion for the state employee to ensure compliance," and "[s]imilar to *Umansky*, although there is not a specific time identified in the [h]andbook, there is an ongoing duty to ensure parents are informed about staff concerns."

The facts of *Umansky* are materially distinguishable. First, the District handbook is nowhere near as detailed about the specific task required as was the railing mandate at issue in *Umansky*. Second, contrary to William's argument, the railing mandate in *Umansky* did identify a definite time for compliance: whenever there was an "open-sided floor or platform 4 feet or more above adjacent floor or ground level" it must be guarded by a railing. *See id.*, ¶¶16-17 (citation omitted). Thus, *Umansky* has no applicability here.

duties are ministerial—to the contrary, 'for a duty to be ministerial, a public officer must be not only bound to act, but also bound by law to act in a very particular way[.]'" (alteration in original; citation omitted)).

¶21    Accordingly, we agree with the District that the handbook's lack of specificity necessitates a conclusion that the handbook does not prescribe a duty that is "absolute, certain and imperative, involving merely the performance of a specific task" because the handbook does not "define[] the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *See Engelhardt*, 385 Wis. 2d 86, ¶32 (citation omitted).  Thus, the District's handbook does not impose a ministerial duty.

## II.  Known and Compelling Danger

¶22    Next, William argues that Heskin's involvement with him was a known and compelling danger, and, therefore, the dangerous situation created a ministerial duty for the District to act.  William clarifies his argument on appeal, explaining that the known danger was "Heskin's grooming behavior"[13] and "not the sexual assaults themselves."  Accordingly, he explains, the fact that the District was unaware of the sexual involvement between Heskin and William prior to the May 2019 disclosure is inconsequential to the question of immunity.

---

[13] William does not define what conduct is encompassed by his use of the term "grooming," except to note that "[t]he inordinate and unexplained time Heskin spent alone with [William] and her inappropriate contact with him were clear signs of grooming."  *See Groom*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/groom (last visited Apr. 11, 2024) ("[T]o build a trusting relationship with (a minor) in order to exploit them especially for nonconsensual sexual activity.").  Given that William does not dispute that Heskin and William endeavored to keep their involvement secret and therefore the District was not aware of the details of their communications or interactions outside of school or even behind closed doors at school, we must assume that William is using "grooming" to refer only to Heskin and William's interactions that were visible to the District's staff on school grounds.

Instead, "the circumstances of Heskin's grooming are a known and compelling danger precluding governmental immunity." William asserts that "[t]eachers repeatedly brought Heskin's behavior to the attention of School District Administrators because it was obvious that an inappropriate relationship had developed between the two. The danger was not only physical contact, as the circuit court's decision seems to suggest, but the inappropriate relationship and grooming."

¶23 Governmental immunity does not apply under circumstances where liability is based upon a failure to properly respond to a particular danger that is "compelling and known … and is of such force that the public officer has no discretion not to act." *Lodl*, 253 Wis. 2d 323, ¶34 (citations omitted). In other words, "a dangerous situation will be held to give rise to a ministerial duty only when 'there exists a known present danger of such force that the time, mode and occasion for performance is evident with such certainty that nothing remains for the exercise of judgment and discretion.'" *Id.*, ¶38 (citation omitted). For this exception to apply, "the danger must be so compelling that a 'self-evident' and 'particularized' … action is required," but "[i]t is not enough that the situation require the employee 'to do something about it.'" *Voss ex rel. Harrison v. Elkhorn Area Sch. Dist.*, 2006 WI App 234, ¶18, 297 Wis. 2d 389, 724 N.W.2d 420 (citation omitted); *see also American Fam.*, 341 Wis. 2d 413, ¶26 ("[T]he exception is reserved for situations that are more than unsafe, where the danger is so severe and immediate that a specific and immediate response is required" and "where injury is almost certain to occur.").

¶24 Applying these standards to the circumstances of this case, we conclude that the known and compelling danger exception does not apply. For the purpose of this decision, we accept William's claims that the District's staff

15

reported concerns about Heskin between Fall 2018 and March 2019, and we need not recount each report. Our review of the record suggests that these concerns included reports that William was keeping his basketball in Heskin's classroom, that Heskin and William were often seen having conversations in the doorway of Heskin's classroom, and that Heskin was not properly managing her classroom generally. At most, the reports stated that William was spending time in Heskin's classroom during lunchtime and after school; that Heskin was spending time with students in her classroom with the door closed, at first without specifically identifying William; and that the time Heskin was spending with William was "odd" and made some staff "uncomfortable." It appears undisputed, however, that none of the staff reported any physical contact between Heskin and William or reported any suspicions that a physical involvement might be occurring.

¶25 Given the circumstances, we agree with the circuit court that these facts do not present a known and compelling danger. Even if we accept that the District knew that Heskin and William were communicating outside of classroom hours, sometimes behind a closed classroom door, and that other staff members thought this was inappropriate, we are not prepared to conclude that these facts alone demand a finding of a dangerous circumstance of such force that the District had no discretion not to act. The District simply had no additional information—such as, for example, that Heskin had previously been accused of impropriety with a student (there is nothing in the record to suggest that she had been) or that Heskin and William were seen engaging in anything more than conversation—to suggest that Heskin posed a more immediate danger. *See Voss*, 297 Wis. 2d 389, ¶¶2, 19-20 (observing that given the use of sight-altering "goggles" in conjunction with a teacher's knowledge of other dangerous factors, it "should have been self-evident to the teacher that the activity was hazardous and the only option was

to put an end to it"); ***Engelhardt***, 385 Wis. 2d 86, ¶¶54-55 (suggesting that it was not only the risk of bringing a child to a water park that created the danger, but it was also the knowledge that the child could not swim, the water park was busy, and seventy-six other children were in the group).

¶26 Citing ***Voss***, William argues that "[f]or the known and compelling danger exception to apply, only the general danger of the circumstances needs to be known," "not knowledge of the specific injury that resulted." *See **Voss***, 297 Wis. 2d 389, ¶20. William points again to Policy 3213 as evidence that the District was already aware of "the danger of associating with students, even if it only gives the appearance of impropriety." Further, he claims that "[t]he danger of educator sexual misconduct [generally] is well known," given that "[a] report prepared for [t]he Department of Education estimates that one in ten students will experience school employee sexual misconduct by the time they graduate from high school."

¶27 We do not agree that only "knowledge of the general danger of the circumstances" is sufficient under the known danger exception. As the District argues, William's definition represents an oversimplification of the exception. Our supreme court has explained that "[t]he nature of the danger" must be "compelling and known to the [public] officer" and must be "of such force that the public officer has no discretion not to act." ***Engelhardt***, 385 Wis. 2d 86, ¶33 (citation omitted). That definition is not equivalent to general knowledge of a situation that could be dangerous or could later become dangerous. Rather, the known and compelling danger exception applies under "conditions that are nearly certain to cause injury if not corrected." *See **Voss***, 297 Wis. 2d 389, ¶19.

17

¶28 As the District argues, "[m]any teachers spend time with students outside of the classroom for legitimate, pedagogical reasons. To conclude that teachers who do so are 'known dangers' would result in a gross enlargement of the known danger exception to immunity." Even Policy 3213, which William cites, acknowledges that "professional staff member[s]" may "associat[e] with students *in private* for legitimate or proper reasons." (Emphasis added.) Automatically assuming ill intent when a teacher develops a relationship of trust with a student and interacts with that student outside of classroom time would be inconsistent with the known danger exception, which is a "narrow, judicially-created exception" to governmental immunity. *See Lodl*, 253 Wis. 2d 323, ¶4. Requiring school districts to act in an unspecified manner to avoid liability in such situations, based on such scant evidence of danger, is not the law in Wisconsin.

¶29 William also argues that "[t]he fact that [there] were multiple ways for [the principal] to react to the repeated concerns from teachers does not render the 'known danger' exception inapplicable." He cites the *Engelhardt* court's discussion of *Cords v. Anderson*, 80 Wis. 2d 525, 541, 259 N.W.2d 672 (1977), where a hiking trail was "known by the park manager to be particularly hazardous at night," and the fact "[t]hat there were at least two possible ways for the park manager to fulfill his ministerial duty did not affect the resolution of the case" because "[s]imply allowing for the exercise of discretion does not suffice to bring the actions under the blanket of immunity … when the facts or the allegations reveal a duty so clear and absolute that it falls within the concept of a ministerial duty." *Engelhardt*, 385 Wis. 2d 86, ¶¶36, 59-60 (citation omitted). However, we note that the *Engelhardt* court also explained that while "there may have been several possible ways in which [the city] could have fulfilled its ministerial duty," that fact "does not affect the resolution of the instant case" because "it is sufficient

for [the court] to conclude that a ministerial duty was created by the obviously hazardous circumstances presented." *Id.*, ¶60.

¶30 Here, we reach the opposite conclusion for the same reason. For the reasons already explained, the circumstances presented in this case were not so obviously hazardous that we must conclude that a ministerial duty was created. Whether we conclude that there were multiple ways for the District to have responded to the staff's concerns or whether we categorize a response from the District as discretionary has no bearing on our known and compelling danger analysis.

¶31 To be clear, we do not dispute that Heskin is, in fact, truly dangerous, that her criminal behavior breached every duty to which we hold educators, that this is a nightmare scenario for any parent who sends their child to school believing that he or she will be safe from harm, and that William's life has been forever changed in ways that we may not yet even be aware. However, the law provides that the District is immune from liability for William's negligence claims under the circumstances of this case.

*III.* *Costs*

¶32    Finally, William argues that the circuit court erroneously assessed WIS. STAT. § 814.03 statutory costs against him.[14]  He claims that assessing costs against him personally violates his rights to due process and to equal protection. According to William, his status as a minor means that he is in a different class than adult plaintiffs because "he cannot make any decisions regarding litigation."

¶33    We conclude that William's argument that the circuit court erred by assessing costs against him is underdeveloped.  First, William provides a legal overview of the due process clause and the equal protection clause, but, as the

---

[14] Although none of the parties challenged our appellate jurisdiction on this issue, we believe it is worth addressing.  *See McConley v. T.C. Visions, Inc.*, 2016 WI App 74, ¶4, 371 Wis. 2d 658, 885 N.W.2d 816 ("It is the duty of this court, notwithstanding the fact that no party has raised the issue, to take notice of its jurisdiction and dismiss an appeal if taken from a nonappealable order.").  Wisconsin case law is clear that the January 18, 2023 order, dismissing the complaint "with prejudice and WITH costs" was final for purposes of appeal.  *See Leske v. Leske*, 185 Wis. 2d 628, 633, 517 N.W.2d 538 (Ct. App. 1994).  The law is also clear that the January 18 order did not incorporate the March 20, 2023 order on taxation of costs entered after William's notice of appeal was filed.  *See State v. Jacobus*, 167 Wis. 2d 230, 233-34, 481 N.W.2d 642 (Ct. App. 1992) ("[A]n appeal from a judgment does not embrace an order entered after judgment.").  Thus, because William did not file a notice of appeal from the circuit court's March 20 order, we lack appellate jurisdiction to consider that order.  *See, e.g.*, *McConley*, 371 Wis. 2d 658, ¶10; *Kenosha Pro. Firefighters, Local 414 v. City of Kenosha*, 2009 WI 52, ¶15, 317 Wis. 2d 628, 766 N.W.2d 577 ("A final judgment or final order pertaining to fees or costs may be appealed separately from any appeal of the merits of the underlying dispute.").

In this appeal, however, William appears to challenge whether the District should have been awarded costs under WIS. STAT. § 814.03, not whether the circuit court should have allowed certain costs under WIS. STAT. § 814.04.  The court's January 18, 2023 order awarded the District costs, but it does not appear that the court specifically addressed William's objections to costs at that time.  We also do not know if the court addressed William's renewed objections and issued a ruling during the March 13, 2023 hearing, which occurred after William filed his notice of appeal, because the transcript of the hearing was not included in the record.  Thus, we question whether William is truly appealing the court's decision on costs in the January 18 order or the March 20, 2023 order.  However, given that the January 18 order did grant costs, given that William objected to the January 18 order's proposed language prior to its entry, and given that William is not challenging the award of certain costs, we determine that we have jurisdiction to consider the issue.

District observes, he "fails to articulate how the statutory award of costs violated either of those laws." Instead, William advances public policy arguments. According to William, by law he was required to be represented by a guardian ad litem (GAL) in this suit[15] and was therefore unable to control the litigation. Further, he asserts that "unlike adults, he lacks the capacity to earn funds to pay such costs, thereby incurring interest that he similarly cannot pay."[16] Finally, William claims that "there is no rational state interest in creating a debtor class of injured children who owe thousands of dollars to insurance companies that they cannot pay."

¶34 Because the circuit court granted summary judgment to the District, our statutes mandate an award of its costs. *See* WIS. STAT. § 814.03(1); ***Taylor v. St. Croix Chippewa Indians***, 229 Wis. 2d 688, 696, 599 N.W.2d 924 (Ct. App. 1999); *see also* WIS. STAT. § 814.04. William has not cited any statutory or case law authority in support of an exemption for minors or indigent individuals from a *mandatory* award of costs. *See* ***State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (arguments undeveloped or unsupported by relevant

---

[15] After the complaint had been filed in this case, William's attorney filed a consent of GAL for William, and the circuit court issued an order appointing his attorney as GAL. The District argues that William mistakenly cited WIS. STAT. § 879.21(1) for the proposition that "[a GAL] shall be appointed for any person interested who is a minor." The District claims that § 879.21(1) is likely a typographical error, as that section addresses appearances for persons domiciled in a foreign country. The District then asserts that if William meant to cite WIS. STAT. § 879.23(1) that would also be an error because WIS. STAT. ch. 879 applies to probate proceedings.

Regardless, the District claims that William's argument is inapplicable because under WIS. STAT. § 803.01(3)(b)2., "only minor plaintiffs under the age of 14 are required to have a [GAL] appointed on their behalf," and William was sixteen when he commenced this action. Thus, the District argues that "he only needed an attorney to appear on his behalf (which he had)."

[16] The District notes that William is no longer a minor.

legal authority will not be considered on appeal).  William also does not cite a single case or other legal authority for our consideration on the issue of whether public policy should negate the clear statutory authority for the imposition of costs.  *See id.*  In summary, William has set forth no credible, articulated basis for how the imposition of statutory costs violates his rights.

*By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.